IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

TIMOTHY MAGUIRE HATFIELD,

        Plaintiff,

        v.

OREGON DEPARTMENT OF
CORRECTIONS, and LT. FROST,

        Defendants.

No. 03:12-cv-00883-HZ

FINDINGS OF FACT &
CONCLUSIONS OF LAW

Wayne D. Landsverk
Michael Mohr
MILLER NASH LLP
3400 Bancorp Tower
111 S.W. Fifth Avenue
Portland, Oregon 97204

    Attorneys for Plaintiff

Ellen F. Rosenblum
ATTORNEY GENERAL
/ / /

1 - FINDINGS OF FACT & CONCLUSIONS OF LAW

Michael R. Washington
SENIOR ASSISTANT ATTORNEY GENERAL
Department of Justice
1162 Court Street NE
Salem, Oregon 97301-4096

      Attorneys for Defendant

HERNANDEZ, District Judge:

      Plaintiff Timothy Hatfield, a former inmate at Deer Ridge Correctional Institution (DRCI), brings this 42 U.S.C. § 1983 claim against Oregon Department of Corrections (ODOC) Lieutenant Rochelle Frost[1], alleging that Frost violated the Eighth Amendment by ordering him to move to an upper bunk despite medical conditions allegedly requiring that he be assigned to a bottom bunk. The case was tried to the Court on September 23, 2014. These are my Findings of Fact and Conclusions of Law. Fed. R. Civ. P. 42(a). As explained below, Plaintiff fails to establish that Frost violated his Eighth Amendment rights.

## FINDINGS OF FACT

      Plaintiff was an inmate in ODOC custody from October 2006 to March 2012. Def.'s Ex. 501. Plaintiff is obese and suffers from a number of health problems. See generally Def.'s Ex. 508 (Plaintiff's ODOC medical records). Because he has sleep apnea, he uses a CPAP machine[2]. He also has a history of injuries to his right knee.

      On several occasions during his incarceration, Plaintiff received orders restricting him to

---

[1] The ODOC itself is no longer a Defendant in the case.

[2] As noted in my March 31, 2014 Opinion & Order denying Defendant's motion for summary judgment, CPAP refers to "Continuous Positive Airway Pressure." Mar. 31, 2014 Op. [ECF 61] at 3 n.1. The machine assists persons with breathing problems, including those with sleep apnea. Id.

2 - FINDINGS OF FACT & CONCLUSIONS OF LAW

a lower bunk. Pl.'s Ex. 5 at 5 (Nov. 6, 2006); at 4 (Mar. 24, 2008); at 3 (Nov. 13, 2009); at 2 (Nov. 12, 2010). Three of those orders included a restriction to a lower tier as well. Id. at 5 (Nov. 6, 2006); at 3 (Nov. 13, 2009); at 2 (Nov. 12, 2010). The March 24, 2008 order, however, expressly stated that a top tier and stairs were "ok" and indicated that the lower bunk restriction was because of Plaintiff's CPAP machine and not because of his other medical conditions. Id. at 4. The medical records noted that the lower bunk and lower tier orders were each effective for one year. Pl.'s Ex. 5 at 2-5. Typically, lower bunk restrictions for medical reasons are obtained by inmates who request the restriction from the prison medical staff. Although Plaintiff's lower bunk restrictions were intermittently ordered and sometimes had actually expired, Plaintiff never had a top bunk assignment during his ODOC incarceration.

On February 3, 2012, while housed at DRCI, Plaintiff received a "72 Hour Conduct Order" restricting him to his cell/bunk for 72 hours as a result of being in an unauthorized area and engaging in disrespectful conduct. Def.'s Ex. 503. Aside from the low bunks reserved for inmates with medical needs, low bunks are used as an incentive to reward those inmates who have at least thirty days of good conduct. As a result of Plaintiff's misconduct order, he was ineligible for an incentive-based low bunk assignment. Because his last low bunk restriction from Health Services was issued on November 12, 2010 and had expired one year later in 2011, he no longer had an effective medically-related low bunk restriction. Accordingly, Plaintiff was reassigned to a top bunk.

On the morning of February 5, 2012, ODOC Sergeant Maximo Platiro told Plaintiff he had to move to the top bunk. Platiro and Plaintiff agree that Plaintiff told Platiro that Plaintiff was fat, had a bad knee, and did not want to move to the top bunk. They also agree that Plaintiff

3 - FINDINGS OF FACT & CONCLUSIONS OF LAW

indicated a need for a low bunk because of his CPAP machine. Their testimony diverged, however, as to whether Plaintiff told Platiro that climbing to the top bunk created a risk of injury to Plaintiff because it was dangerous for him to do so. Platiro testified Plaintiff did not make such a statement; Plaintiff testified that he did. I need not resolve the issue of what Plaintiff said to Platiro because I assume, for the purposes of this decision, that Plaintiff told Platiro that climbing to the top bunk posed some risk of injury to Plaintiff.

Platiro responded to Plaintiff's concerns by first looking at the ODOC computer record referred to as the "400." There, he found no current lower bunk restriction for Plaintiff. Because the "400" does not contain all relevant information about an inmate's medical condition, Platiro next called DRCI's Health Services staff to inquire if Platiro had "missed something" in looking up the records. Health Services confirmed that Plaintiff had no lower bunk restriction. At that point, Platiro called the "Officer-in-Charge," or OIC, who was Defendant Frost[3].

Platiro testified that his practice is to call the OIC whenever there is a "situation," which in this case was Plaintiff resisting the move to the top bunk. Platiro called Frost to confirm the top bunk order. He told her that Plaintiff had no lower bunk restriction, that he had looked this up on the "400," and that he talked with Health Services. Neither Frost nor Platiro recalled that Platiro told Frost the reasons why Plaintiff was refusing to go to the top bunk. Frost gave Platiro a directive to move Plaintiff to the top bunk because he had no lower bunk restriction.

Based on Frost's directive, Platiro gave Plaintiff a direct order to move to the top bunk or be placed in segregation. Platiro also gave Plaintiff a laundry bag to hold Plaintiff's CPAP

---

[3] Although Frost could not remember exactly when she received the call from Platiro, both Platiro and Plaintiff testified that it occurred before Plaintiff attempted to climb to the top bunk. Based on their testimony, I find that the call occurred at that time.

4 - FINDINGS OF FACT & CONCLUSIONS OF LAW

machine, telling him to hang it from the top bunk while it was still plugged in. Platiro advised Plaintiff that he could sign up for the next day's sick call and request a lower bunk restriction from Health Services at that time. Platiro then left the area.

Plaintiff tried to climb up the ladder to the top bunk. He could not make it and while trying to get back down, he fell and landed on the floor. He hurt his elbow and his shoulder. ODOC Corrections Officer Jayvee Mata responded to Plaintiff's cell area and found Plaintiff lying on the ground. Plaintiff was moaning and groaning and holding his shoulder. Health Services staff arrived within a few minutes and took Plaintiff by wheelchair to examine him.

Jerrie Melton, R.N. noted Plaintiff's chief complaints as elbow and knee pain. Def.'s Ex. 508 at 99. She noted a developing bruise on the left elbow and red marks on the left knee. Id. Plaintiff, however, had full range of motion to his left arm, although he complained of pain. Id. Melton educated Plaintiff on the proper dose of ibuprofen. Id. She advised him to ice the area. Id. He returned to the housing unit by wheelchair. Id.

Plaintiff went to the day room in the housing unit. Health Services told Mata that Plaintiff was fine, but that Plaintiff had been instructed to ice his shoulder and take ibuprofen. Mata observed Plaintiff icing his shoulder in the day room. On instruction from a Sergeant Workman, Mata inquired if Plaintiff was going to report to his assigned top bunk for the 10:30 a.m. count. Plaintiff said he would not. Mata spoke to Workman again. Workman told Mata to give Plaintiff a direct order to report to the top bunk for the morning count. Plaintiff again said no. As a result of refusing to comply with this order, Plaintiff was placed in DRCI's Disciplinary Segregation Unit (DSU). Def.'s Exs. 501, 505, 507. Frost signed the misconduct report completed by Mata, approving of Plaintiff's placement in DSU. Def.'s Ex. 507 at 5. Plaintiff

5 - FINDINGS OF FACT & CONCLUSIONS OF LAW

remained in DSU until February 10, 2012 when he was transferred to a different ODOC facility. Def.'s Ex. 501.

There are approximately 750 inmates at DRCI. At the time of the February 5, 2012 incident, Plaintiff had been housed at DRCI for just under six months. Def.'s Ex. 501. While Frost, as an OIC, regularly walked through the facility and interacted with inmates, she did not know Plaintiff. Thus, when Platiro called to tell her that Plaintiff would not get on the top bunk, Frost did not know that Plaintiff was obese or walked with a limp. Additionally, his medical history was not available to her on the "400" because of federal health privacy regulations. Thus, while Frost likely knew that Plaintiff used a CPAP machine based on information she received from Platiro, she was unaware of Plaintiff's history of intermittent low bunk/low tier orders or of any ongoing medical conditions incompatible with climbing a ladder to the top bunk.

When she later approved of Plaintiff's placement in DSU, Frost had still not observed Plaintiff in person in the housing unit. She knew, however, that he had no bottom bunk restriction. In fact, she "triple-checked" the lack of a bottom bunk restriction. She also knew that after Plaintiff fell, Health Services had determined that Plaintiff was fine and had been returned to the housing unit with ice and instructions to take ibuprofen. When Plaintiff returned to the housing unit from Health Services, Frost had no information from Health Services that Plaintiff required a lower bunk.

## CONCLUSIONS OF LAW

A prison official violates the Eighth Amendment when he or she acts with deliberate indifference to the serious medical needs of an inmate. Crowley v. Bannister, 734 F.3d 967, 978 (9th Cir. 2013). The Eighth Amendment requires that prison officials "take reasonable measures

to guarantee the safety of the inmates[.]" Farmer v. Brennan, 511 U.S. 825, 832 (1994) (internal quotation marks omitted).

> For an inmate to bring a valid § 1983 claim against a prison official for a violation of the Eighth Amendment, he must first "objectively show that he was deprived of something 'sufficiently serious.'" Foster v. Runnels, 554 F.3d 807, 812 (9th Cir. 2009) (quoting Farmer v. Brennan, 511 U.S. 825, 834, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994)). "A deprivation is sufficiently serious when the prison official's act or omission results 'in the denial of the minimal civilized measure of life's necessities.'" Id. (quoting Farmer, 511 U.S. at 834, 114 S. Ct. 1970).
>
> Next, the inmate must "make a subjective showing that the deprivation occurred with deliberate indifference to the inmate's health or safety." Foster, 554 F.3d at 812. To satisfy this subjective component of deliberate indifference, the inmate must show that prison officials "kn[e]w [ ] of and disregard[ed]" the substantial risk of harm, but the officials need not have intended any harm to befall the inmate; "it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." Farmer, 511 U.S. at 837, 842, 114 S. Ct. 1970.

Lemire v. Cal. Dep't of Corr. & Rehab., 726 F.3d 1062, 1074 (9th Cir. 2013).

In section 1983 claims, supervisors are not vicariously liable for the acts of their subordinates because there is no respondeat superior liability under section 1983. Maxwell v. Cnty. of San Diego, 708 F.3d 1075, 1097 (9th Cir. 2013). Instead, supervisory liability must be based on the supervisor's own conduct. Id.

"A defendant may be held liable as a supervisor under § 1983 if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." Starr v. Baca, 652 F.3d 1202, 1207 (9th Cir. 2011) (internal quotation marks omitted). A plaintiff can establish the causal connection by showing that the supervisor set "in motion a series of acts by others" or knowingly refused "to terminate a series of acts by others, which the supervisor knew

or reasonably should have known would cause others to inflict a constitutional injury[.]" Id. at 1207-08 (internal quotation marks and brackets omitted).

Frost did not initially give the order for Plaintiff to move to the top bunk. The law makes clear that she cannot be vicariously liable for any constitutional violations committed by her subordinates simply based on her supervisory status.

Frost's position as the OIC, however, led to her personal involvement in enforcing or confirming the order to move Plaintiff to the top bunk. When Frost told Platiro that he should order Plaintiff to move, Frost became personally involved. She also was personally involved when she later approved of Plaintiff's placement in DSU when he refused to move to the top bunk after he had already fallen on his first attempt.

The objective component of the two-part Eighth Amendment analysis requires a showing that Defendant deprived Plaintiff of the "minimal civilized measure of life's necessities." Grenning v. Miller-Stout, 739 F.3d 1235, 1238 (9th Cir. 2014) (internal quotation marks omitted). "Prison officials have a duty to ensure that prisoners are provided adequate shelter, food, clothing, sanitation, medical care, and personal safety." Johnson v. Lewis, 217 F.3d 726, 731 (9th Cir. 2000).

The evidence at trial establishes that ordering Plaintiff to the top bunk was inconsistent with the duty of ensuring Plaintiff's personal safety. The combination of Plaintiff's obesity and bad knees made it objectively dangerous for him to climb to the top bunk. While one or the other of these conditions alone may not lead to that conclusion, the combination of Plaintiff's weight and inability to flex his knee or knees made both climbing the ladder and attempting to get onto the top bunk, objectively dangerous. Depriving Plaintiff of using the bottom bunk was depriving

8 - FINDINGS OF FACT & CONCLUSIONS OF LAW

him of "something serious."

Nonetheless, I conclude that Plaintiff cannot sustain his claim against Frost. Notably, no other individuals were named as defendants in the action. The only liability to be assessed is Frost's. In the second, subjective part of the Eighth Amendment analysis, the court examines the defendant's deliberate indifference. Whether an official possesses the knowledge of a substantial or excessive risk of harm to inmate health or safety is "a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence[.]" Johnson, 217 F.3d at 734 (internal quotation marks omitted). Knowledge of a risk of harm can be inferred if the risk is obvious. Farmer, 511 U.S. at 842.

The evidence establishes that at the time Frost confirmed the order to move Plaintiff to the top bunk, Frost had no personal knowledge of Plaintiff's identity and did not know that he was obese, had a bad knee, and walked with a limp or altered gait. The evidence further establishes that while Platiro told Frost that Plaintiff had no current lower bunk restriction, that he had confirmed this by looking at the "400," and had called Health Services as well, Platiro did not tell Frost that Plaintiff was significantly obese, had bad knees, or that it could be dangerous to force Plaintiff to climb to the top bunk. Accordingly, at the time Frost spoke to Platiro and confirmed that Platiro should proceed with the top bunk order, Frost lacked knowledge of the facts which would have put her on notice of a substantial risk of harm to Plaintiff if he were forced to climb to the top bunk.

Frost knew that Plaintiff was refusing to get to the top bunk. She knew he had no lower bunk restriction. She knew that Health Services confirmed he had no lower bunk restriction.

9 - FINDINGS OF FACT & CONCLUSIONS OF LAW

She knew he used a CPAP machine.[4]  Knowledge of these facts does not inferentially create an obvious risk of substantial harm.  Plaintiff fails to show that Frost was deliberately indifferent to a substantial risk of serious harm when she ordered Platiro to order Plaintiff to the top bunk.

When Frost later approved of Plaintiff's placement in DSU, she possessed little additional information about Plaintiff.  Although she knew Plaintiff had fallen, she knew that he had been returned to the housing unit, that Health Services indicated he was fine, that Health Services had told him to take ibuprofen and use ice, and that he still had no lower bunk restriction.  When he still refused to report to the top bunk, Workman ordered him taken to DSU.  When Frost signed off on that order, she still lacked the critical information that would have allowed her to conclude that ordering Plaintiff to the top bunk created a substantial risk of harm to his health and safety.  Without more, Frost simply lacked the facts required to show that she was deliberately indifferent.

Finally, Plaintiff suggests that Frost should have examined Plaintiff's medical records, or ordered Platiro to do so, or stayed enforcement of the top bunk order until he could report to sick call with Health Services the next morning.  Plaintiff contends that Frost's failure to do any of these additional steps violates the Eighth Amendment.

Although a failure to act can create supervisory liability in some circumstances, the plaintiff must still show that the supervisor failed to act despite knowing of a substantial risk of

---

[4]  The undisputed testimony is that while using a CPAP machine from the top bunk is not ideal, it has been done at DRCI before.  More importantly, the risk of injury to Plaintiff was created by the need to climb to the top bunk and get into the bunk, not from a problem with the CPAP machine.  Thus, Frost's knowledge that Plaintiff needed a CPAP machine is not knowledge that forcing Plaintiff to climb to the top bunk created a substantial risk of harm to Plaintiff.

10 - FINDINGS OF FACT & CONCLUSIONS OF LAW

serious harm.  E.g., Farmer, 511 U.S. at 837 (Eighth Amendment liability may be based on a showing that the defendant "failed to act despite his knowledge of a substantial risk of serious harm"); Maxwell, 708 F.3d at 1086 (supervisor may be liable under section 1983 if the supervisor "knew of the [constitutional] violations and failed to act to prevent them").  Here, as explained above, Frost lacked the requisite knowledge of a substantial risk of harm.  Thus, whether it is confirming an order to move to the top bunk, placing Plaintiff in DSU, or failing to research his medical history or stay the top bunk order, Frost was not deliberately indifferent to Plaintiff's serious medical needs.

## CONCLUSION

Plaintiff fails to establish an Eighth Amendment claim against Frost.  Judgment will be entered in favor of Defendant.

IT IS SO ORDERED.

Dated this  8  day of  Oct , 2014

Marco A. Hernandez
United States District Judge